UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHRISTOPHER HOLLOMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1071 (RBW) |
| | ) | |
| MICHAEL CHERTOFF, | ) | |
| Secretary for | ) | |
| Department of Homeland Security | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Christopher Holloman, the plaintiff in this civil lawsuit, seeks compensatory damages "in excess of" $300,000 and injunctive relief against Michael Chertoff, the Secretary for the Department of Homeland Security, in his capacity as Secretary for the Cabinet department overseeing the Transportation Security Administration and, through that agency, the Federal Air Marshal Service (the "FAMS"),[1] for alleged unlawful discrimination against the plaintiff on the basis of race and national origin pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (2000). Complaint (the "Compl.") ¶¶ 1, (i)-(iii). Currently before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. After carefully reviewing the pleadings filed in this case, the parties' motions, and all

---

[1] The plaintiff's complaint, filed June 28, 2004, names Thomas J. Ridge, at that time the Secretary for the Department of Homeland Security, as the defendant in this civil case. The Court has substituted Secretary Chertoff as the defendant in lieu of former Secretary Ridge pursuant to Federal Rule of Civil Procedure 25(d)(1).

memoranda and exhibits relating thereto,[2] the Court concludes that it must grant the defendant's motion for summary judgment and deny the plaintiff's cross-motion for the reasons that follow.

## I. Background

The following facts are either admitted or not in dispute.[3] The plaintiff, an African-American who "resides in the State of Maryland," Compl. ¶¶ 3-4, "was hired as a Federal Air Marshall [('FAM')] Officer on June 23, 2002." Pl.'s Facts ¶ 1. His "employment was conditioned upon successful completion" of a training program held at the Federal Law Enforcement Training Center (the "FLETC"), id., in Artesia, New Mexico. Compl. ¶ 11; Def.'s Facts ¶ 2.

"During the evening of July 26, 2002, and the early morning hours of July 27, 2002," Def.'s Facts ¶ 2, the plaintiff, along with fellow FAM trainees Albert Hill (also an African-American), William Felde, and Patrick Hickey (both Caucasian), "stopped at a convenience store[] off the FLETC premises[] to purchase something to eat," Compl. ¶ 12. "As the trainees entered the convenience store, two white local police officers approached Albert Hill, the designated driver," Pl.'s Facts ¶ 3, and "demanded to search the vehicle [in which the p]laintiff

---

[2] In addition to the plaintiff's complaint, the defendant's answer, the defendant's motion for summary judgment and the plaintiff's cross-motion for summary judgment, the Court considered the following documents in reaching its decision: (1) the Defendant's Memorandum of Law in Support of Motion for Summary Judgment (the "Def.'s Mem."), (2) the defendant's Statement of Undisputed Material Facts (the "Def.'s Facts"), (3) the Plaintiff's Opposition to Defendant's Motion for Summary Judgment (the "Pl.'s Opp'n"), (4) the Plaintiff's Response to Defendant's Statement of Material Facts, (5) the Memorandum in Support of Plaintiff's Motion for Summary Judgment (the "Pl.'s Mem."), (6) the Plaintiff's Statement of Material Issues of Fact (the "Pl.'s Facts"), (7) the Memorandum in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Response to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (the "Def.'s Opp'n"), (8) the Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute, (9) the Plaintiff's Errata Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment (the "Pl.'s Reply") and (10) the Plaintiff's Errata Adding Exhibit to Motion.

[3] Unless otherwise noted, all allegations from the complaint cited herein are admitted in the defendant's answer, and all statements from the parties' statements of material facts cited herein are undisputed.

and his companions were traveling[,]" Compl. ¶ 14. "Upon search[ing] the vehicle, the officer found a beer bottle in the rear passenger floor board[,] . . . a cooler [(]also in the rear[)] with an unopened bottle of beer and a half bottle of Bacardi," Pl.'s Facts ¶ 4, and "an open bottle of beer on the floor near the front passenger seat," id. ¶ 5.

The officer asked the plaintiff whether "the open bottle of beer on the floor near the front passenger seat . . . belonged to him." Id. ¶ 5. When the plaintiff "denied that he drank from the beer bottle while on the parking lot of [the convenience store], but admitted that he drank from the bottle earlier," the officer "issued a citation for an [o]pen [c]ontainer infraction." Id. ¶ 6.[4] In contrast, "[t]he officer asked Patrick Hickey ([one of the] white trainee[s]) to discard the empty bottle [that the officer] found near [Hickey] in the rear of the vehicle" without issuing a citation to Hickey. Id. ¶ 4. Of the four trainees, the plaintiff was the "only person" who received a citation. Id. ¶ 6.[5]

The officer who issued the plaintiff a citation also prepared a "supplemental report" that he appended to the citation. Def.'s Mem., Ex. C (State of New Mexico Supplemental Report) (the "Supplemental Report"). In that report, the officer states that the plaintiff became "very irate and verbally abusive" when approached by the officer, and had to be "physically subdue[d]" by his fellow trainees "as he became out of control." Id. at 1. The police officer further states that

---

[4] Pursuant to § 66-8-138 of the New Mexico Code, "[n]o person shall knowingly have in his possession on his person, while in a motor vehicle upon any public highway within this state, any bottle, can or other receptacle containing any alcoholic beverage that has been opened or had its seal broken or the contents of which have been partially removed." N.M. Stat. § 66-8-138(B).

[5] Although this fact was neither alleged nor stipulated to by the parties, there is undisputed evidence in the record that the plaintiff was also cited for disorderly conduct. See Def.'s Mem., Ex. B (State of New Mexico Uniform Incident Report) at 1 (reflecting the plaintiff's citation for both an open container violation and "disorderly conduct" in violation of N.M. Stat. § 30-20-1).

3

the plaintiff later said "that he was from 'D.C.' and didn't care about any open container citation." Id. The police officer states that at that point he "cited [the plaintiff] into the [m]agistrate court in Artesia." Id.

The FAMS "launched an investigation of the incident" the very next day. Pl.'s Facts ¶ 7. As part of this investigation, "[the p]laintiff and the other FAM trainees[] were asked to write affidavit statements." Id. The trainees neither corroborated nor contradicted the specific factual allegations made in the Supplemental Report in their statements; however, two of the trainees noted the plaintiff's uncooperative behavior in dealing with the local police. See Def.'s Mem., Ex. J (Untitled Statement of Patrick Hickey) (the "Hickey Statement") at 2 ("The [o]fficer gave [the plaintiff] every opportunity possible to tell the truth and put this in the past[,] but [the plaintiff] would not comply and tell the truth."); id. at Ex. L (Memorandum to FAM Oversight Training Committee from William Felde) (the "Felde Memo") at 2 (describing the plaintiff as being "[t]he only person in our group that gave the officer any attitude"). In an interview with Timothy Davis, the "Team Leader on the Training Oversight Committee [(the 'Training Committee')] at [the] FLETC," Pl.'s Facts ¶ 2, the plaintiff "complained that he thought that the Eddy County Police Officers harassed him solely because of his race," id. ¶ 7. Nevertheless, Davis "recommended [the p]laintiff's dismissal." Id.

On July 31, 2002, "[the p]laintiff was removed from the training program based upon the incident that occurred at the convenience store on July 27, 2002." Compl. ¶ 17. "Via letter dated August 23, 2002," the FAMS terminated the plaintiff from his probationary position, citing "his behavior during the incident that led to his [citation]," which "caused the FAMS to lose confidence in his ability to perform as a [FAM]." Def.'s Facts ¶ 4. Specifically, the FAMS cited

4

the plaintiff's "[lack of] judgment and uncooperative attitudes towards a local law enforcement officer" as the basis for the plaintiff's termination.  Id.  "The termination letter stated that the other trainee[s'] witnesses' declarations corroborated the incident as alleged by the police officer."  Pl.'s Facts ¶ 9.

The plaintiff appealed his termination to the Merit Systems Protection Board on September 20, 2002.  Def.'s Facts ¶ 5.  That appeal was dismissed "for lack of jurisdiction," id. ¶ 6, prompting the plaintiff to "file[] a formal complaint of discrimination" with the Equal Employment Opportunity Commission in which he "alleged race and color discrimination because he was removed from employment," id. ¶ 7.  The plaintiff filed his complaint in this Court on June 28, 2004.

After a protracted discovery period and failed attempt at mediation, the defendant filed his motion for summary judgment on July 6, 2007.  The plaintiff filed an opposition to that motion on September 10, 2007, and a separate cross-motion for summary judgment on September 12, 2007.  Briefing on the parties' cross-motions closed on October 23, 2007.

The defendant asserts that summary judgment in his favor is appropriate for two reasons.  First, the defendant argues that "[the p]laintiff cannot establish a prima facie case of race discrimination because the circumstances under which he was terminated do not give rise to an inference of discrimination."  Def.'s Mem. at 9.  Second, the defendant contends that the plaintiff cannot sustain his "ultimate burden of persuasion that [the d]efendant discriminated against him because of his race or color" because the defendant's "concern regarding [the p]laintiff's suitability to perform in a highly sensitive law enforcement position requiring good judgment in an extremely successful environment" is a "legitimate[,] non-discriminatory reason[]" for

terminating the plaintiff's employment that "cannot be considered pretextual." Id. at 11.

The plaintiff contests both of these points. He argues that an inference of discrimination arises where a plaintiff "did not engage in the conduct for which he was disciplined," Pl.'s Mem. at 9, or where "employees not of [the plaintiff's] protected group who[] engage in comparable acts [are] not punished," Pl.'s Opp'n at 9, and that the plaintiff satisfies both of these conditions, see id. (arguing that the plaintiff "did not engage in the conduct for which he was issued [the] citation" that led to his termination); see also id. (arguing that a reasonable jury could infer discrimination because similarly situated co-workers of the plaintiff were not terminated despite their misconduct); Pl.'s Mem. at 12 (same). The plaintiff further argues that the defendant's proffered reason for terminating his employment was pretextual because a white trainee "was recommended for termination due to his poor judgment," but, unlike the plaintiff, "was permitted to graduate," Pl.'s Mem. at 11; see also Pl.'s Opp'n at 14 ("Notwithstanding the white trainee's uncooperativeness and disrespect towards FLETC instructors and other trainees throughout the duration of the program, upper management refused to terminate the white trainee and he was permitted to graduate."), and because there is evidence in the record suggesting that the Training Committee was determined to eliminate the plaintiff from the FAMS program because of his race, see Pl.'s Reply at 12-14 (pointing to various items in the record that purportedly suggest racial bias on the part of the Training Committee).

## II. Standard of Review

The parties seek summary judgment pursuant to Federal Rule of Civil Procedure 56. Under that rule, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

6

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.  When ruling on a Rule 56 motion, the Court must view the evidence in the light most favorable to the non-moving party.  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must also draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true.  Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). The non-moving party, however, cannot rely on "mere allegations or denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal quotation and citation omitted), for "conclusory allegations unsupported by factual data will not create a triable issue of fact."  Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation and citation omitted).  If the Court concludes that "the non-moving party has failed to make a sufficient showing on an essential element of h[is] case with respect to which []he has the burden of proof," then the moving party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### III. Legal Analysis

Title VII provides that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a).  Where, as here, there is no direct evidence of discrimination on one of these impermissible categories, the Court assesses the plaintiff's claim under the framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  Under the McDonnell Douglas framework, "the plaintiff must establish a prima facie case of discrimination" in the first instance, Reeves, 530 U.S. at 142, after

which "the burden shifts to the defendant, who must 'articulate some legitimate, non-discriminatory reason' for the adverse action.'" Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting McDonnell Douglas, 411 U.S. at 802). Assuming that the defendant can satisfy that burden, "the McDonnell Douglas framework–with its presumptions and burdens–disappear[s]," Reeves, 530 U.S. at 142-43 (internal quotation and citation omitted), and "the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

To establish a prima facie case of unlawful discrimination, a plaintiff must show that "(1) []he is a member of a protected class; (2) []he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005) (internal quotation and citation omitted). The defendant concedes that the plaintiff "is a member of a class protected by Title VII based on his race," Def.'s Mem. at 9, and does not dispute the self-evident point that the plaintiff's termination was an "adverse employment action."[6] Instead, he argues that "[the p]laintiff has failed to raise an inference of

---

[6] "It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." Buggs v. Powell, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) (Walton, J.). The Court's authority to treat unopposed arguments as conceded derives from Local Civ. R. 7(b), which states as follows:

> Within 11 days of the date of service or at such other time as the court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion.  <u>If such a memorandum is not filed within the prescribed time, the court may treat the motion as conceded.</u>

(Emphasis added.) "Courts have interpreted this local rule to apply to specific arguments within a memorandum opposing a motion." United States v. Real Property, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) (Walton, J.). The District of Columbia Circuit "'ha[s] yet to find that a district court's enforcement of this rule constituted an abuse of discretion.'" Buggs, 293 F. Supp. 2d at 141 (quoting FDIC v. Bender, 127 F.3d 58, 67-68 (D.C. Cir. 1997) (internal
(continued...)

possible race[-] or color[-]based discrimination" because he "cannot identify any similarly situated employees of a different race or color who were treated more favorably than he when confronted with an incident which led to a field citation arrest." Id. at 10.  The plaintiff counters that he "is not required to identify similarly-situated individuals outside of his protected classification in order to establish prima facie discharge discrimination" if "'he did not engage in the conduct for which he was disciplined,'" Pl.'s Opp'n at 8 (quoting Plummer v. Bolger, 559 F. Supp. 324, 329 (D.D.C. 1983)), and that in any event other similarly situated Caucasian FAM trainees were not terminated despite engaging in the same conduct as the plaintiff, see id. at 12-14 (describing alleged unpunished misconduct by various Caucasian FAM trainees).

The plaintiff has the better of this argument in one respect.  "Although one method by which a plaintiff can satisfy the third prong of the prima facie test is by demonstrating that []he was treated differently from similarly situated employees who are not part of the protected class, this is not the only way." Czekalski, 475 F.3d at 365-66 (internal quotation and citation omitted).  Rather, a plaintiff in a discharge case can also satisfy the third prong of the prima facie requirement by "show[ing] that the discharge was not attributable to the two most common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." Id. at 366 (internal quotation and citation omitted).  The Court has therefore endeavored to determine whether there is any genuine dispute of material fact with respect to either of these scenarios, and, having made such a determination,

---

[6](...continued)
citations omitted)).  The Court therefore declines "to act as an advocate for [] [the parties] and construct their legal arguments on [their] behalf in order to counter those in the motion to dismiss." Real Property, 287 F. Supp. 2d at 61 (internal quotation and citation omitted).

9

concludes for the reasons that follow that neither scenario is present in this case and that as a consequence the plaintiff cannot establish a prima facie case of discrimination.

A.     Similarly Situated Employees

"In evaluating whether the plaintiff and the relevant co-worker[s] [we]re similarly situated, the nature of the offenses committed and the punishments imposed are the most significant variables in a case alleging discrimination in connection with disciplinary actions." Santa Cruz v. Snow, 402 F. Supp. 2d 113, 125-26 (D.D.C. 2005) (internal quotation and citation omitted).  The plaintiff asserts that he "can prove an inference of discrimination by showing that Patrick Hickey and William Felde were found to be physically proximate to the same evidence of a violation (open alcohol containers)" as the plaintiff, but were not "cited by the police officers []or . . . disciplined by [the d]efendant."  Pl.'s Opp'n at 9.  He also claims that "another similarly[] situated white trainee who was recommended for termination from the program because of his seeming[] lack of judgment" was not terminated by "upper management" despite "the white trainee's uncooperativeness and disrespect towards FLETC instructors and other trainees throughout the duration of the program."  Id. at 13-14.  The Court finds neither of these assertions persuasive.

The plaintiff's assertion regarding Hickey and Felde is irrelevant because, as Timothy Davis, the leader of the Training Committee's investigation into the incident who recommended the plaintiff's termination, testified at his deposition, it was not the citation for possession of an open container of an alcoholic beverage that led to the plaintiff's dismissal.  Davis Dep. 89:17-19 (Feb. 23, 2007) ("Q. Was Mr. Holloman also recommended to be dropped from the program because of an open container?  A. No, sir, that was not the reason.").  Rather, it was the

plaintiff's belligerence and obduracy during his encounter with the local law enforcement officers that caused Davis to recommend his termination from the FAM program. See id. at 58:17-23 (explaining that Davis recommended that the plaintiff be terminated "[b]ased on . . . his lack of judgment" because, whereas the "other trainees that were in the vehicle with [the plaintiff] . . . all resolved the incident with the police officer in a satisfactory manner, [the plaintiff] did not"). Adam Kistler, the manager of the training division at FAMS who decided to terminate the plaintiff's employment, followed Davis's recommendation for that same reason. See Kistler Aff. ¶ 7 (citing the plaintiff's "lapse in judgment in failing to cooperate with, and adopting an antagonistic toward, local law enforcement" as the reason why Kistler "los[t] confidence" in the plaintiff's ability to meet the requirements of the FAM position).

      Nothing in the record remotely suggests that any of the other FAM trainees who were with the plaintiff on the night when he received his citation engaged in the bellicose manner exhibited by the plaintiff. The police officer who issued a citation to the plaintiff stated in his police report that the plaintiff "became very irate and verbally abusive" when he was approached by the officer, "using obscenities" and "bec[oming] more and more agitated" as the plaintiff's encounter with the officer progressed, whereas the other trainees stated that "they did not want any trouble." Supplemental Report at 1. According to Hickey, the officer stated that the other trainees "had done nothing wrong" and "appreciated the honesty and cooperation that [the other trainees] gave him." Hickey Statement at 2; see also Supplemental Report at 1 (stating that the police officer who issued a citation to the plaintiff "thanked [Hickey] for his honesty") . Felde stated that "[t]he only person in our group that gave the officer any attitude was [the plaintiff]," and that, "if not for the actions of one individual [(i.e., the plaintiff), the trainees] would have

11

been back at [the] FLETC and in bed by 1 [a.m.] ready for the next training day." Felde Memo at 2.

Of all the witnesses to the plaintiff's encounter with the police, only Albert Hill failed to mention the plaintiff's obstinate behavior. See Def.'s Mem., Ex. K (Untitled Statement of Albert Hill) (the "Hill Statement") at 1-2 (noting only that the officer at the scene issued a citation to the plaintiff for the beer located by the front passenger seat). But Hill did not contradict the other witnesses, either. Instead, he reported only that when the police officer asked the plaintiff for consent to search the trainees' car, the plaintiff stated that he "didn't agree with it, but gave consent anyway." Id. at 2. The plaintiff's own statement is also silent on this point. Pl.'s Opp'n, Ex. 3 (Untitled Statement by Christopher Holloman) at 1 (stating only that all of the trainees gave the officer consent to search their car after talking about the matter).

In light of the unrebutted evidence in the record establishing that the plaintiff was the only person who refused to cooperate with local law enforcement, there is no genuine issue of disputed material fact as to whether the other FAM trainees present at the scene of the plaintiff's citation were similarly situated to the plaintiff. There is simply no question that, as a factual matter, the other FAM trainees did not engage in the same "offense[]" as that committed by the plaintiff. Snow, 402 F. Supp. 2d at 125. Accordingly, a reasonable jury could not infer racial discrimination from the fact that these other trainees were not subjected to the same "punishment[]." Id.

The plaintiff's argument that some other, unnamed trainee at the FLETC was similarly situated to the plaintiff because he also displayed a "lack of judgment," Pl.'s Opp'n at 13, is even less plausible. The argument rests entirely on certain deposition testimony from Davis in which

he described an unnamed trainee who, <u>inter alia</u>, showed up late at the airport, Davis Dep. 47:17-22 (Feb. 23, 2007), threw his shaved-off hair on the yard at the FLETC training facility after he was instructed to cut his hair, <u>id.</u> at 47:24-48:10, and "had constant problems with . . . every other student in his particular class, all [of] the mentors, [and] all of the instructors," <u>id.</u> at 48:11-14. Although this trainee was "a pretty good performer" who "was actually number one in his class on academics," <u>id.</u> at 48:15-16, Davis "recommended that he be dropped from training based on the totality of the circumstances with him," <u>id.</u> at 48:21-23. "However, [Davis] was overruled by training management in Atlantic City." <u>Id.</u> at 48:24-25.

     As is readily apparent from the Court's recitation of Davis's deposition testimony, there is nothing remotely similar about the circumstances surrounding the recommendations for termination of the plaintiff and this unnamed trainee. The plaintiff was cited for a violation of New Mexico's open container law and disorderly conduct after he refused to cooperate with local law enforcement. Incident Report at 1. The unnamed trainee "g[ot] into verbal arguments with his other classmates," was "disrespectful to the instructors," and "would . . . show up late to particular assignments." Davis Dep. 49:7-11 (Feb. 23, 2007). Setting aside any questions as to the wisdom of the Training Committee's decision to retain the unnamed trainee, there is no equivalency between engaging in rude behavior towards fellow trainees and instructors and refusing to cooperate with local law enforcement to such an extent that a citation is issued. Consequently, a reasonable jury could not infer racial discrimination from comparing the two situations based on the different treatment afforded the two trainees.

B.	Reason for Discharge

As the Court explained above, the FAMS terminated the plaintiff's employment because Kistler "los[t] confidence in [the plaintiff's] ability to perform as a Federal Air Marshal" after the plaintiff's encounter with local law enforcement. Def.'s Mem., Ex. A (Letter from Adam Kistler, Manager, Federal Air Marshal Program Training to Christopher Holloman (Aug. 23, 2002)) (the "Kistler Letter") at 1. According to Kistler, both the officer who issued a citation to the plaintiff and the plaintiff's colleagues on the scene "reported that [the plaintiff] w[as] uncooperative" and was "very irate and verbally abusive" to the officer. Id. Because the plaintiff, "[a]s a law enforcement officer, . . . had a duty to cooperate with the police officer," and "did not do [so] to [Kistler's] satisfaction," Kistler "determined that it w[ould] promote the efficiency of the [FAMS] to terminate [the plaintiff's] employment as a FAM." Id. at 2.

Kistler's explanation for the plaintiff's termination clearly reflects his judgment that the plaintiff "perform[ed] below [the FAM's] legitimate expectations," one of the two "most common legitimate reasons for discharge." Czekalski, 475 F.3d at 366. Indeed, Kistler explained in an affidavit prepared in connection with this case that the FAM "position requires good judgment and frequent communication and cooperation with local law enforcement officials." Kistler Aff. ¶ 7. The plaintiff's "lapse in judgment in failing to cooperate with, and adopting an antagonistic attitude toward, local law enforcement" caused Kistler to "lose confidence" in the plaintiff's ability to meet those requirements. Id.

The plaintiff argues at length "that he did not engage in the conduct for which he was issued a citation[] and, subsequently[,] terminated." Pl.'s Opp'n at 9. But that argument is beside the point. While the adverse treatment of an employee based on fabricated charges of

14

misconduct might ordinarily give rise to an inference of discrimination because it suggests bad faith on the part of the employer, see, e.g., Plummer, 559 F. Supp. at 329 (holding that a plaintiff may satisfy the McDonnell Douglas by, inter alia, "prov[ing] that . . . he did not engage in the conduct for which he was disciplined"),[7] such an inference is not warranted here because the FAMS was not responsible for the issuance of a citation to the plaintiff and "should not be held liable under Title VII for the alleged racially discriminatory acts of third parties with whom [the FAMS] has no affiliation and over whom [the FAMS] had no control or influence." Williams v. Astra USA, Inc., 68 F. Supp. 2d 29, 35 (D. Mass. 1999); see also Rosenbloom v. Senior Resource, Inc., 974 F. Supp. 738, 743 (D. Minn. 1997) (finding no "case law where an employer has been held liable for the racial harassment of an employee by a third party"). Instead, the only way that Kistler's decision to terminate the plaintiff's employment could give rise to an inference of discrimination would be if (1) the plaintiff did not engage in the conduct for which he was

---

[7] In Plummer, a postal worker in the District of Columbia sued William Bolger, then the Postmaster General for the United States Postal Service, in his official capacity for alleged race, ethnic, and sex discrimination under Title VII. See Plummer, 559 F. Supp. at 328-29 (recounting the factual and procedural background of the plaintiff's suit). After a bench trial before a former member of this Court, the Court entered findings of fact and conclusions of law in which it held that the plaintiff, a Caucasian male, had failed to satisfy the additional burden imposed on "reverse discrimination" claims that the plaintiff demonstrate "'background circumstances support[ing] the suspicion that the defendant is that unusual employer who discriminates against the majority.'" Id. at 329 (quoting Parker v. Baltimore & Ohio R.R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981)). The Court then concluded that even if the plaintiff had satisfied the additional requirements of a "reverse discrimination" claim, he still would not have met the prima facie requirement set forth in McDonnell Douglas because, even though the plaintiff "alleged that he did not engage in the conduct for which he was disciplined[,] . . . the Court . . . found that [the] plaintiff did do the things for which he was disciplined." Id.

Plummer relied upon Green v. Armstrong Rubber Co., 612 F.2d 967 (5th Cir. 1980), and Sullivan v. Boorstin, 484 F. Supp. 836 (D.D.C. 1980), in articulating the standards for the plaintiff to satisfy McDonnell Douglas's prima facie requirement. Since that time, the District of Columbia Circuit has articulated the three-part standard employed by the Court in the instant memorandum opinion. See supra Part III. Nevertheless, the general principle set forth in Plummer strikes the Court as fundamentally sound in most instances insofar as that principle is applied within the context of the three-part standard enunciated by the District of Columbia Circuit. However, to the extent that Plummer could be read to suggest that a plaintiff could establish a prima facie case of racial discrimination solely by showing that he did not engage in the conduct for which he was disciplined, i.e., without having to satisfy the first and second prongs of George's tripartite test, George, 407 F.3d at 412, the case must be rejected as contrary to the controlling precedent in this Circuit.

cited <u>and</u> (2) Kistler (or some other member of the Training Committee responsible for the plaintiff's termination) knew that the defendant had not engaged in the conduct for which he was cited.

Nothing in the record establishes that Kistler,[8] Davis,[9] or any other member of the Training Committee had any desire or opportunity to abet the alleged racial prejudice of the officer who issued the plaintiff the citation.[10] The only piece of evidence that comes remotely close to implying such an understanding is one part of Hill's deposition testimony in which he opines that the officer who issued a citation to the plaintiff "had to" have known "the people there at that training facility for the FAM and for the FLETC" because "he was at the graduation chumming it up with them when [Hill] graduated." Hill Dep. 96-97 (March 20, 2007) (cited in Pl.'s Reply at 12-13).[11] This kind of "[i]nnuendo and suspicion," based on nothing more than the

---

[8] The plaintiff points to Kistler's statement that "[t]he officer [who issued the plaintiff a citation] and [the plaintiff's] FLETC colleagues, who were present at the time, reported that [the plaintiff was] uncooperative and had to be subdued by [the plaintiff's] colleagues," Kistler Letter at 1, as evidence of pretext because "the declarations of the trainees . . . never stated that [the p]laintiff had to be subdued, nor do their statements imply an occurrence of such conduct." Pl.'s Opp'n at 17.  But this apparent error at most suggests that Kistler slightly overstated the amount of evidence supporting his conclusion that the plaintiff should be terminated, not that the conclusion itself was a fabrication.  It certainly does not give rise to an inference that Kistler knew of and overlooked the alleged racial discrimination of the police officer in citing the plaintiff for violation of New Mexico's open container law and for disorderly conduct.

[9] The plaintiff suggests that Davis falsely "testified that he personally met and interviewed each of the trainees," Pl.'s Opp'n at 17, and that this testimony "was vehemently disputed by . . . Hill in his deposition," <u>id.</u>  Hill actually testified that he could not remember meeting with Davis in the past, not that he had never done so.  <u>See</u> Hill Dep. 56 (March 20, 2007) ("Q. . . . And again[,] . . . you can't recall who Mr. Timothy Davis was during that time period or if you ever met with Mr. Timothy Davis, correct[?]  A. No.").

[10] To the contrary, Davis testified at his deposition that he took into consideration the plaintiff's allegations of racial discrimination by the police officer who issued the plaintiff the citation in making his recommendation to Kistler, Davis Dep. 101:15-17 (Feb. 23, 2007), but nevertheless recommended that he be dismissed from the FAMS training program based on his "personal interviews" with all of the FAM trainees involved in the incident and the police report, <u>id.</u> at 65:10-12, 17-19.

[11] Other supposed examples of racial prejudice culled from Hill's deposition transcript are even more delusory.  For example, the plaintiff points to a passage in the deposition where Hill states that before he wrote his

(continued...)

fact that "some" unidentified "people" were "chumming it up" with the officer who issued a citation to the plaintiff, "do[es] not substitute for evidence that the decision to remove [the plaintiff] from FLETC training was motivated by considerations of race."  Turner v. Fed. Law Enforcement Training Ctr., Civil Action No. 04-0606 (HHK), 2007 WL 4355170, at *8 (D.D.C. Dec. 14, 2007).

In any event, it is plain from the record before the Court that the plaintiff did in fact commit the offenses for which he was cited.  According to the Supplemental Report, only two open containers of alcoholic beverages were found in the trainees' car: "a 12[-]ounce bottle of Michelob light beer about three quarters full, which was still cold to the touch, on the passenger side of the floorboard, centered in the middle," and "another 12[-]ounce bottle of Michelob light"

---

[11](...continued)
statement to the Training Committee his mentor told him that he should "be careful what [he] wr[o]te" because "they[] [were] looking at [Hill]" and "watching [him]," Hill Dep. 75 (March 20, 2007) (quoted in Pl.'s Reply at 13). This cryptic comment from Hill's mentor is so devoid of any context that it cannot permit any reasonable inference with respect to those FAMS personnel in a position to affect Hill's employment, much less an inference that those personnel were prejudiced against Hill (or, by implication, the plaintiff) on the basis of race.

The plaintiff also points to a conversation between Hill and a "Mr. Gant" at lunchtime, id. at 72, during the course of which Mr. Gant stated that "they said they had to get rid of that black guy." Id. at 75 (quoted in Pl.'s Reply at 13).  Like the purported warning from Hill's mentor, this quote is too vague to permit any sort of inference with respect to why the plaintiff was terminated. It is simply impossible to discern from this double hearsay statement (1) whether it was Gant or someone in the Training Committee who referred to the plaintiff as "that black guy," (2) whether Gant intended to convey his belief that someone on the Training Committee felt that the FAMS had to terminate "that black guy" because he was African-American, or instead meant to convey that someone on the Training Committee had used the phrase "black guy" as a way of describing someone who had been terminated from the FAMS, or (3) whether the unknown member of the Training Committee who may or may not have described the plaintiff as a "black guy" actually believed that the FAMS intended to terminate the plaintiff because of his race or was simply using race and gender as a shorthand for describing someone who had been terminated for some legitimate reason.  The Court recognizes that it is obligated to draw all inferences in the plaintiff's favor in considering the defendant's motion for summary judgment, but (setting aside for the moment the inadmissibility of the statement on hearsay grounds) a reasonable factfinder would have to engage in nothing less than rank speculation to conclude that anyone on the Training Committee was biased against the plaintiff because some unidentified group of individuals was "watching" Hill and another FAMS employee described the plaintiff as a "black guy" in the lunchroom.

that "was empty and warm." Supplemental Report at 1.[12] Significantly, the plaintiff freely admits that the half-filled bottle belonged to him. See Holloman Dep. 72:9 (Jan. 9, 2007) ("And [the officer] said, [']Whose beer was this?  Whose liquor was this?[']  And then he said, [']Is this your beer in the front seat?[']  I said, [']Yeah.  It's mine.[']"); id. at 78:4 ("I'm not going to lie about drinking a beer in the parking lot.  I just had a beer earlier tonight.  It was mine."); id. at 78:5 ("[The beer] was mine from earlier that night.").

The plaintiff's mere possession of an open container of beer while he was in the car violated New Mexico's open container law.  See N.M. Stat. § 66-8-138(B) (prohibiting the "knowing[] . . . possession . . . , while in a motor vehicle upon any public highway within this state, any bottle . . . containing any alcoholic beverage that has been opened").  And the plaintiff's "irate and verbally abusive" behavior towards the officer who issued him the citation, Supplemental Report at 1, plainly constituted "violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace."  N.M. Stat. § 30-20-1(A).  Thus, the plaintiff cannot credibly argue that he did not commit the offenses for which he was cited and (with respect to his behavior towards the police officer who issued him a citation) his employment terminated.

The plaintiff also contends that "his actions of denying [that] he was drinking in the

---

[12] All of the witnesses to the plaintiff's citation corroborate this account.  According to Hickey, the police officer who issued the plaintiff a citation "found a half-full beer in the passenger seat floor where [the plaintiff] was sitting . . . and found an empty beer bottle in the back right seat floor," which, in the officer's estimation, "was dry and must have been from earlier."  Hickey Statement at 1.  Felde stated in his internal memorandum to the Training Committee that "[w]hen the officer searched the car he found an open beer sitting on the front passenger side floor where [the plaintiff] had been sitting" and "an empty beer bottle on the rear passenger floor where [Hickey] had been sitting," and that the officer "searched the rest of the car and a cooler that was in the car without any further incident."  Felde Memo at 1-2.  Finally, Albert Hill stated that when the officer began his search of the car "there was one empty bottle [of beer] on the rear floorboard[] and one bottle [of beer] on the front floorboard [of unknown quantity]."  Hill Statement at 2.

parking lot and initially declining consent to search his vehicle do[] not rise to the level of misconduct that warranted termination," Pl.'s Opp'n at 9, and that "a jury should be able to decide . . . whether a delayed consent to search a vehicle is a basis for [the] disciplinary actions [taken against the p]laintiff," id. at 12.  But "Title VII . . . does not authorize a federal court to become a superpersonnel department that reexamines an entity's business decisions," Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (internal quotation and citation omitted), and the Court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive."  Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  The unrebutted evidence in the record suggests that Kistler's only motive in terminating the plaintiff was to "promote the efficiency of the [FAMS]," Kistler Letter at 2, and this Court has neither the authority nor the inclination to pass judgment on the wisdom of any managerial decisions made by Kistler in service to that motive.

In short, there is no evidence in the record giving rise to an inference of discrimination on the part of the FAMS.  Absent such evidence, the plaintiff cannot satisfy the prima facie requirement of McDonnell Douglas.  The Court must therefore grant summary judgment in the defendant's favor.

### III. Conclusion

"The central focus of the inquiry in a case such as this is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin."  Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978) (internal quotation and citation omitted) (emphasis added).  Plainly, the plaintiff feels aggrieved, perhaps justifiably

19

so,[13] by the treatment he received by the police officer who issued him the citation on the morning of July 27, 2002. Whatever one might think about the police officer's conduct that night, there is no basis in the record for concluding that the plaintiff's employer had reason to believe that the officer's actions were legally unjustified, but nevertheless terminated the plaintiff's employment because of his race. And without such evidence, the officer's conduct cannot be imputed to the defendant and, accordingly, the plaintiff cannot even muster a prima facie case for discrimination by the defendant on the basis of the plaintiff's race. Thus, the undisputed evidence in the record leaves the Court with no choice but to grant summary judgment in the defendant's favor.

**SO ORDERED** this 11th day of February, 2008.[14]

REGGIE B. WALTON
United States District Judge

---

[13] Without question, there is at least a genuine dispute of material fact as to whether the police officer who issued the plaintiff a citation behaved in a racially discriminatory manner. See, e.g., Hill Dep. 45 (March 20, 2007) ("Q. As a black man and as a black law enforcement officer[,] did you perceive that you and Mr. Holloman were being treated that night–is it your opinion that you all were treated differently that night based on race or color? A. Yes."). But the police officer who issued the plaintiff a citation is not the defendant in this law suit. It is the conduct of the plaintiff's former employer that is at issue in this case, and nothing in the record suggests that any employee of the FAMS was in any way complicit in the police officer's alleged wrongdoing.

[14] An order granting the defendant's motion for summary judgment, denying the defendant's cross-motion for summary judgment, granting summary judgment in favor of the defendant on the plaintiff's wrongful termination claim, and closing this case follows.