UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
CHRISTOPHER S. HOLLOMAN,            )
                                    )
            Plaintiff,              )
                                    )
     v.                             )     Civil Action No. 04-1071  (RBW)
                                    )
MICHAEL B. CHERTOFF,                )
Secretary of Homeland Security,     )
                                    )
            Defendant.              )
_____)

**MEMORANDUM OPINION**

Christopher Holloman, the plaintiff in this civil lawsuit, seeks compensatory damages exceeding $300,000 and injunctive relief against Michael Chertoff, the Secretary for Homeland Security, in his official capacity as Secretary for the Cabinet department overseeing the Transportation Security Administration and, through that agency, the Federal Air Marshal Service (the "FAMS"), for alleged unlawful discrimination against the plaintiff on the basis of his race and national origin pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (2000).  Complaint (the "Compl.") ¶¶ 1, (i)-(iii).  On February 11, 2008, the Court issued a memorandum opinion in which it concluded that "the plaintiff cannot even muster a prima facie case for discrimination," thus "leav[ing] the Court with no choice but to grant summary judgment in the defendant's favor."  Holloman v. Chertoff, 533 F. Supp. 2d 162, 175 (D.D.C. 2008) (Walton, J.).  Currently before the Court is the plaintiff's motion to alter or amend the Court's order effectuating that decision.  After carefully reviewing the Court's prior

memorandum opinion, the plaintiff's motion, and all memoranda of law relating to that motion,[1] the Court concludes that it must deny the plaintiff's motion for the reasons that follow.

## I. Analysis

"As this Court has noted in the past, motions for reconsideration under Rule 59(e) are disfavored and should be granted only under extraordinary circumstances." Agrocomplect, AD v. Republic of Iraq, 247 F.R.D. 213, 215 (D.D.C. 2008) (Walton, J.) (internal quotation and citation omitted). Indeed, such a motion "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Messina v. Krakower, 439 F.3d 755, 758 (D.C. Cir. 2006) (internal quotation and citation omitted). "[The p]laintiff's motion is brought under the third prong" of this standard. Pl.'s Mem. at 2.

In its prior memorandum opinion,[2] the Court "endeavored to determine whether there [was] any genuine dispute of material fact," Holloman, 533 F. Supp. 2d at 169, with respect to two threshold questions: (1) whether the plaintiff "'was treated differently from similarly situated employees'" of the FAMS "'who [were] not part of the protected class,'" id. at 168 (quoting Czekalski v. Peters, 475 F.3d 360, 365-66 (internal quotation and citation omitted)), and (2) whether the plaintiff's discharge from the FAMS was attributable to anything other than "'the two most common legitimate reasons for discharge,'" id. at 168-69; i.e., "'performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether,'"

---

[1] In addition to the Court's prior memorandum (along with the underlying documents considered by the Court in rendering that opinion, see Holloman, 533 F. Supp. 2d at 164 n.2 (listing those documents)), and the plaintiff's motion, the Court considered the following documents in reaching its decision: (1) the Plaintiff's Memorandum of Points & Authorities in Support of Motion for Reconsideration (the "Pl.'s Mem."), and (2) the Defendant's Memorandum in Opposition to Plaintiff's Motion for Reconsideration.

[2] For purposes of brevity, the Court will refrain from recapitulating the factual and procedural background of this case. A full accounting of these details is set forth in the Court's prior memorandum opinion. See Holloman, 533 F. Supp. 2d at 164-67 (setting forth the factual and procedural background of this case).

2

id. at 169 (quoting <u>Czekalski</u>, 475 F.3d at 366 (internal quotation and citation omitted)).  The former question turned on whether the plaintiff could present evidence demonstrating that his situation was similar to that of his fellow FAM trainees who were with him on the night of his encounter with a local law enforcement officer that ultimately led to his dismissal from the FAMS or to another FAM trainee who had been disciplined for disruptive behavior during training but was not discharged like the plaintiff.  <u>Id.</u> at 169-71.  The latter question depended upon whether the plaintiff could adduce any evidence that the explanation given for the plaintiff's termination—his failure to cooperate with a local law enforcement officer when confronted about an open container of alcohol in the car used by all of the FAM trainees—was a pretext for racial discrimination.  <u>Id.</u> at 171-74.  Ultimately, the Court found in favor of the defendant on both counts.  <u>See</u> <u>id.</u> at 170 ("[T]here is simply no question that, as a factual matter, the other FAM trainees did not engage in the same offense as that committed by the plaintiff." (internal quotation and citation omitted)); <u>id.</u> ("There is nothing remotely similar about the circumstances surrounding the recommendations for termination of the plaintiff and [the] unnamed trainee."); <u>id.</u> at 174 ("there is no evidence in the record giving rise to an inference of discrimination on the part of the FAMS").

The plaintiff does not dispute that the legal issues delineated above control this case, nor does he assert that the Court overlooked any evidence in the record prior to issuing its ruling. His sole argument in support of reconsideration is that "the record is replete with material issues of fact[] [that] are disputed," the resolution of which "requires making a credibility determination" about "evidence disputed by more than merely the [p]laintiff." Pl.'s Mem. at 2. He then lists twelve different issues as to which he concludes there is a genuine dispute of material fact. <u>Id.</u> at 2-3.  He does not specify how the Court erred in concluding that no such

3

dispute existed with respect to these facts, though he does note that "the fact that [the p]laintiff denies using profanity, obscenities, and the need to be restrained, and [that] Albert Hill[, another FAM trainee who was present when the plaintiff allegedly confronted local law enforcement,] does not include these salacious facts . . . creates a question of fact" to be resolved by a jury. Id. at 3.

The plaintiff's laundry list of asserted factual disputes, without more, does nothing to convince this Court that its initial analysis of the plaintiff's case was in error. As the Court explained in its memorandum opinion, the police officer who issued an "open container" citation to the plaintiff as well as two of the three FAM trainees who were with the plaintiff when he received that citation stated that, of the four FAM trainees at the scene of the citation, only the plaintiff failed to cooperate with local law enforcement officers. Holloman, 533 F. Supp. 2d at 169-70. "[O]nly Albert Hill failed to mention the plaintiff's obstinate behavior," and he "did not contradict the other witnesses, either." Id. at 170. Indeed, the plaintiff himself was "silent on this point." Id. Thus, the "unrebutted evidence in the record establish[ed] that the plaintiff was the only person who refused to cooperate with local law enforcement," and "a reasonable jury could not infer racial discrimination from the fact that" the other FAM trainees "were not subjected to the same punishment" as the plaintiff, id. at 170 (internal quotation and citation omitted), because those trainees, unlike the plaintiff, did not treat local law enforcement in a "belligeren[t] and obdura[te]" manner, id. at 169.[3]

---

[3] The plaintiff suggests that there is a factual dispute as to "[w]hether [he] was arrested or charged with disorderly conduct." Pl.'s Mem. at 2. This fact is irrelevant because the plaintiff was not discharged for being arrested or charged with disorderly conduct, but rather was terminated because the reports given by the officer who issued a citation to the plaintiff and the two FAM trainees who corroborated the officer's story led the manager of the training division at the FAMS to conclude that the plaintiff did not act in a manner appropriate for a federal air marshal. Holloman, 533 F. Supp. 2d at 171.

4

The plaintiff suggests that Albert Hill's silence regarding the plaintiff's attitude towards local law enforcement "should be construed as a contradiction" of the statements made by the other FAM trainees and the officer who issued a citation to the plaintiff. Pl.'s Mem. at 4. But even if a reasonable jury could somehow interpret Hill's utter silence on this point as evidence that the plaintiff did not act in an aggressive manner when engaged by the local law enforcement officer, the undisputed fact remains that only one of the FAM trainees—the plaintiff—was accused by a local police officer and two of his peers of acting inappropriately. No such accusations were made against the white FAM trainees at the scene by the police office, the plaintiff, Hill, or anyone else; consequently, these other trainees were not similarly situated to the plaintiff when the FAMS meted out punishment for the night's events.[4]

The plaintiff also takes issue with the Court's conclusion that he was not similarly situated to another trainee "who, inter alia, showed up late at the airport, . . . threw his shaved-off hair on the yard at the [Federal Law Enforcement Training Center (the "FLETC")] training facility after he was instructed to cut his hair, . . . and had constant problems with every other student in his particular class, all of the mentors, and all of the instructors," but was not terminated from the FAMS despite a recommendation to the contrary by the same FAMS

---

[4] Had the officer who issued a citation to the plaintiff also complained of disrespectful behavior by the white FAM trainees, the plaintiff would have been similarly situated to the white trainees, and his termination from the FAMS, absent evidence that the white trainees were also terminated, would have given rise to an inference of discrimination. Alternatively, had the plaintiff established (1) that his behavior was no different from the white FAM trainees, (2) that the officer who issued him a citation treated the plaintiff differently from the white trainees, and (3) the FAMS personnel who made the recommendation and decision to terminate the plaintiff knew this to be the case, the plaintiff could have established an inference of discrimination because the disparate treatment by the officer would, under that scenario, be imputed to the FAMS. However, there is no evidence in the record that the white FAM trainees acted inappropriately when confronted by local law enforcement, let alone any evidence that the FAMS knew this to be the case but treated the plaintiff differently anyway. Nor is there any evidence that the FAMS knew that the plaintiff was the victim of racial discrimination by the officer who issued him a citation when it decided that his behavior warranted termination. See Holloman, 533 F. Supp. 2d at 172 n.10 (noting the unrebutted evidence in the record to the effect that the FAMS Training Committee member who recommended the plaintiff's termination considered the plaintiff's allegations of racial discrimination in arriving upon a recommendation, but concluding that these allegations were without merit "based on his personal interviews with all of the FAM trainees involved in the incident and the police report." (internal quotation and citation omitted)).

Training Committee officer who recommended the plaintiff's termination.  Holloman, 533 F. Supp. 2d at 170 (internal quotation and citation omitted).  The Court concluded that there "[was] nothing remotely similar about the circumstances surrounding the recommendations for termination of the plaintiff and this unnamed trainee," id., a judgment the plaintiff criticizes as "subjective," Pl.'s Mem. at 3.  To the contrary, the Court made an objective assessment that "a reasonable jury could not infer racial discrimination from comparing the two situations based on the different treatment afforded the two trainees" because "there [was] no equivalency between engaging in rude behavior towards fellow trainees and instructors and refusing to cooperate with local law enforcement to such an extent that a citation [was] issued."  Holloman, 533 F. Supp. 2d at 171.  The plaintiff may not agree with this conclusion, but it was not, as the plaintiff suggests, a "credibility issue[]" improperly resolved by the Court.  Pl.'s Mem. at 3.

In addition to his challenges to the Court's finding that the plaintiff was not similarly situated to other FAM trainees, the plaintiff continues to dispute the legitimacy of the "open container" citation issued to him.  See Pl.'s Mem. at 2-3 (listing as a factual dispute "[w]hether the [p]laintiff engaged in the conduct for which he was disciplined," and "[w]hether [the two white FAM trainees present when the plaintiff received his citation] were physically proximate to open containers and not cited or disciplined").  The Court has already explained, however, that this "argument is beside the point," Holloman, 533 F. Supp. 2d at 171, "because the FAMS was not responsible for the issuance of a citation to the plaintiff and should not be held liable under Title VII for the alleged racially discriminatory acts" of the officer who issued the plaintiff his citation, "with whom the FAMS ha[d] no affiliation and over whom the FAMS had no control or influence," id. at 172.  Instead, the Court reasoned that to link the FAMS to the officer's alleged racial discrimination the plaintiff had to show both that "the plaintiff did not engage in the

6

conduct for which he was cited" (to demonstrate racial discrimination by the officer who issued the citation) <u>and</u> that the person or persons responsible for the plaintiff's termination "knew that the [plaintiff] had not engaged in the conduct for which he was cited" (to demonstrate the complicity of FAMS personnel in that racial discrimination).  <u>Id.</u>

It was on this latter point that the Court ruled in favor of the defendant, finding "[n]othing in the record establish[ing] that [anyone connected with the FAMS] had any desire or opportunity to abet the alleged racial prejudice of the officer who issued the plaintiff the citation."  <u>Id.</u>  The plaintiff states elliptically that there is a genuine factual dispute as to "[w]hether there was evidence in the record for a reasonable juror to conclude a complicity of wrongdoing between the [o]fficer [who issued a citation to the plaintiff] and FAM supervisors," Pl.'s Mem. at 2, but does not specify what evidence he has in mind when he makes that bald assertion.  The Court found only one piece of evidence that "[came] remotely close to implying such an understanding": a portion of Albert Hill's deposition testimony in which Hill "opines that the officer who issued a citation to the plaintiff had to have known the people there at that training facility for the FAM and for the FLETC because he was at the graduation chumming it up with them when Hill graduated."  <u>Holloman</u>, 533 F. Supp. 2d at 173 (internal quotation and citation omitted).  But as the Court noted in its prior memorandum opinion, "[t]his kind of innuendo and suspicion" is not really <u>evidence</u> of racial discrimination at all, just unsubstantiated and unfounded speculation by one FAM trainee.  <u>Id.</u> (internal quotation and citation omitted).

The plaintiff further argues that he presented "direct evidence of discrimination" by FAMS personnel in the form of deposition testimony from Hill to the effect that he "overheard [a] discriminatory reference to [the p]laintiff by [a] FAM supervisor."  Pl.'s Mem. at 4.  In point of fact, the deposition testimony referenced by the plaintiff does not establish that the person

7

uttering the statement in question was "[a] FAM supervisor" or that the reference in question was intended to be "discriminatory." Instead, the testimony refers "to a conversation between Hill and a 'Mr. Gant' at lunchtime, . . . during which Mr. Gant stated that 'they said they had to get rid of the black guy.'" Holloman, 533 F. Supp. 2d at 173 n.11 (internal quotation and citation omitted). As the Court explained in its memorandum opinion:

> [T]his quote is too vague to permit any sort of inference with respect to why the plaintiff was terminated. It is simply impossible to discern from this double hearsay statement (1) whether it was Gant or someone in the Training Committee who referred to the plaintiff as "that black guy," (2) whether Gant intended to convey his belief that someone on the Training Committee felt that the FAMS had to terminate "that black guy" because he was African-American, or instead meant to convey that someone on the Training Committee has used the phrase "black guy" as a way of describing someone who had been terminated from the FAMS, or (3) whether the unknown member of the Training Committee who may or may not have described the plaintiff as a "black guy" actually believed that the FAMS intended to terminate the plaintiff because of his race or was simply using race and gender as a shorthand for describing someone who had been terminated from some legitimate reason.

Id.

Once again, the plaintiff implies that the Court engaged in its own factfinding to reach this conclusion. See Pl.'s Mem. at 4 ("Any inference based on [this] disputed fact[] is the sole province of the jury."). The Court did nothing of the sort. It simply recognized that "a reasonable factfinder would have to engage in nothing less than rank speculation to conclude that anyone on the Training Committee was biased against the plaintiff because . . . another FAMS employee described the plaintiff as a 'black guy' in the lunchroom." Holloman, 533 F. Supp. 2d at 173 n.11 (emphasis added). Moreover, the statement is so devoid of context that it simply cannot give rise to any inference regarding the FAMS Training Committee or its members.

## II. Conclusion

The plaintiff's entire motion is predicated on the notion that any hint of any kind of racial discrimination by anyone towards the plaintiff—regardless of how inadmissible, tenuous, or unrelated to the plaintiff's termination that "evidence" actually is—warrants a jury trial under Federal Rule of Civil Procedure 56. The rule is not so generous. It requires a jury trial where there are <u>genuine</u> issues of <u>material</u> fact in dispute, <u>see</u> Fed. R. Civ. P. 56(c) (requiring summary judgment where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law"), and on that score the plaintiff's arguments are sorely lacking. The absence of any material evidence suggesting racial discrimination in the plaintiff's termination compelled the Court to grant summary judgment in the defendant's favor, and it compels the Court to deny the plaintiff's motion for reconsideration as well.

**SO ORDERED** this 13th day of October, 2008.[5]

REGGIE B. WALTON
United States District Judge

---

[5] This memorandum opinion relates to a prior order issued by the Court denying the plaintiff's motion for reconsideration.